UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| MARIA HAMILTON and DAMON WRIGHT, on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs | ) ) | |
| vs. | ) ) | CAUSE NO. 3:05cv434RM |
| AMERICAN CORRECTIVE COUNSELING SERVICES INC., et al., | ) ) ) | |
| Defendants | ) | |

OPINION AND ORDER

Maria Hamilton and Damon Wright brought this suit on behalf of themselves and all others similarly situated, against American Corrective Counseling Services (ACCS) and its affiliates, alleging that certain practices associated with bad check diversion programs violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692 *et seq*. The plaintiffs also bring claims under Indiana law for conversion, fraudulent misrepresentation, and negligent misrepresentation. The court has jurisdiction under 28 U.S.C. § 1331.

A variety of motions pend. For the reasons that follow, the court grants summary judgment to the defendants as to whom this case is not stayed because the plaintiffs' remedy, if the law entitles them to one, is against ACCS, which is in bankruptcy. All other motions are denied, either on their merits or as moot.

I.

ACCS contracts with local prosecutors to operate bad check diversion programs in more than four hundred prosecutors' offices across the country. Six diversion programs in Indiana (Allen, Marion, Noble, Porter, St. Joseph, and Vigo Counties) are at issue in this case. These programs purportedly offer people who have written bad checks to retailers a chance to avoid criminal prosecution by participating in an educational seminar, making restitution of the check amount, and paying administrative fees.

ACCS contracts with each prosecuting attorney with which it operates after negotiating the fees to be charged and how those fees will be allotted. The contracts provide that the diversion programs will be run under the county prosecutor's name, authority, and control, and the prosecutor authorizes the format, content, and frequency of written communications by ACCS. The contracts and the written communications generally follow a standard form.

Once the program is established, ACCS receives "bad check crime reports" from deception victims, either through private check collection agencies or directly from vendors themselves. ACCS personnel use computer programs to compare the information on the reports with a list of eligibility criteria the county prosecutor establishes. If the report satisfies the prosecutor's criteria, ACCS prints and sends a series of letters that the prosecutor has approved to the check writer, without the county prosecutor's review or assessment. These letters are sent on the county prosecuting attorney's letterhead, but ACCS separately maintains the contact

mailing address and phone number.

The letters explain that the prosecutor's office "will agree to refrain from initiating prosecution" if the check writer participates in the check diversion program. The letter indicates that the program is optional but that a "failure to respond may result in criminal charges by the prosecuting attorney." Check writers who think they received the letter in error are told to contact the prosecutor's office; those who want to contest the allegations are told that they can appear in court and are advised to consult an attorney. Recipients who don't respond to the first notice get more letters offering enrollment in the program and might also be contacted by "case coordinators," who are trained to make follow-up phone calls using a script.

If ACCS completes its collection efforts and the check writer still refuses to pay, ACCS screens the check writer against "prosecution review criteria" that vary from jurisdiction to jurisdiction. ACCS generally only refers to county prosecutors unpaid checks that meet a minimum dollar amount. Cases are referred to county prosecuting attorneys only when prosecutors ask for them and not on a routine basis.

The named plaintiffs in this case, Maria Hamilton and Damon Wright, both received letters offering participation in St. Joseph County's bad check diversion program. Ms. Hamilton wrote two checks, totaling about $90, that didn't clear. In June 2004, she got a letter from a debt collector (Certegy, Inc.), stating that it had redeposited her check and that she owed a service charge.

The next month, Ms. Hamilton received a notice letter from ACCS offering participation in the St. Joseph County diversion program. Believing that the Certegy letter indicated that the checks had already been paid, Ms. Hamilton went to the county prosecutor's office, where she was told to write a letter to the prosecutor. Ms. Hamilton continued to get notices from ACCS indicating the possibility of prosecution, and she paid the check amounts plus partial fees. The St. Joseph County prosecutor's office never received a report regarding Ms. Hamilton or determined that she should be prosecuted.

Mr. Wright's bad check to Kroger was referred to ACCS. Mr. Wright got an official notice letter from ACCS asking for the check amount plus fees to participate in the diversion program. Mr. Wright made two installment payments and attended the bad check educational seminar. Mr. Wright says he decided to participate in the program because he thought that he would be jailed if he didn't.

A

ACCS claims that it acts as a ministerial agent of the prosecutor's office, but the plaintiffs allege that the debts arising from the unpaid checks are "debt" as the FDCPA defines it, and ACCS is acting as a "debt collector" in administering the diversion programs. The plaintiffs allege that the defendants used false, deceptive, and misleading representations in violation of the FDCPA. The plaintiffs seek a permanent injunction barring the defendants from continuing their current collection methods, declaratory relief that the collection letters violate the FDCPA,

and statutory and actual damages under the FDCPA. The plaintiffs further allege fraud and conversion charges against the defendants based on their operation of the diversion programs.

The court granted ACCS's motion for partial judgment on the pleadings with respect to the plaintiffs' due process and equal protection claims, but denied the motion to the extent that ACCS asked the court to abstain from exercising jurisdiction based on pending criminal proceedings against Mr. Mealing or the principles of federalism.

The court later granted the plaintiffs' motion for certification of a class of Indiana citizens who received one of several form collection letters from ACCS about the diversion programs. The court certified the class as to the FDCPA and misrepresentation claims but denied the plaintiffs' motion as to the conversion claims.

After the parties filed their cross-motions for summary judgment, each side filed objections and motions to strike. Magistrate Judge Christopher Nuechterlein decided several of the motions that dealt with discovery-related issues. He denied the defendants' joint motion to strike evidence filed in support of the plaintiffs' summary judgment motion and in opposition to the defendants' summary judgment motion, finding that while the plaintiffs tried to use evidence not disclosed during discovery, the evidence was being used for impeachment purposes only. Consequently, the magistrate judge denied the motion to strike and granted the plaintiffs' motion for leave to file certain financial statements and

independent auditor reports over the defendants' objection. The magistrate judge noted that if the evidence in question isn't used for impeachment purposes at the summary judgment stage, the court will simply ignore it.

The magistrate judge also denied the plaintiffs' motion to supplement their partial motion for summary judgment, finding that the deadline for filing dispositive motions had passed long before. The plaintiffs had sought to amend their partial summary judgment motion with four sets of documents acquired from a companion case pending against ACCS in the Northern District of California. This wasn't the plaintiffs' first stab at introducing these documents into this litigation: the court had granted the defendants' motion to quash upon learning that the plaintiffs had subpoenaed themselves after discovery closed, to smuggle the California documents into this litigation despite the court's scheduling order. The plaintiffs' motion to supplement involved the same documents, and the plaintiffs didn't articulate good cause to allow supplemental briefing. The plaintiffs hadn't produced evidence that the defendants had withheld the documents in bad faith or that they had tried to compel the documents from the defendants within the discovery period, nor did plaintiffs rebut the prejudicial effect on the defendants if allowed to supplement their brief. Accordingly, the magistrate judge denied the plaintiffs' motion.

ACCS and two of its affiliates filed voluntary petitions for Chapter 11 bankruptcy on January 19, 2009. After receiving ACCS' suggestion of bankruptcy, the court automatically stayed this case as to ACCS pursuant to 11 U.S.C. §

362(a), and directed the parties to file statements addressing the impact of ACCS' bankruptcy filing on the claims against the non-debtor co-defendants. On February 25, ACCS filed a notice of removal purporting to remove this case to the United States Bankruptcy Court for the Northern District of Indiana and indicating that ACCS would request transfer to the Delaware bankruptcy court. This court declined ACCS' suggestion of an extension of the automatic bankruptcy stay to the non-debtor defendants, finding that the request must be filed in the court in which the bankruptcy action pends. The court further noted that the plaintiffs' alter ego claims (which are discussed later in this opinion) aren't the bankruptcy estate's property and so aren't automatically within the ambit of the bankruptcy stay. The court declined to stay the action to allow the non-debtor defendants to apply for a stay with the Delaware bankruptcy court. Finally, the court withdrew the reference of the action to bankruptcy court and dismissed that case (in the Northern District of Indiana) with prejudice, holding that ACCS' purported removal was improper and statutorily unauthorized. Accordingly, the action is only stayed against ACCS.

B

In addition to ACCS, the plaintiffs sue Don R. Mealing, Lynn R. Hasney, Inc. Fundamentals, Fulfillment Unlimited, Inc., Fundamental Performance Strategies, and ACCS Administration, Inc. The plaintiffs contend that the court should pierce the corporate veil and treat all of the entity defendants as alter egos of ACCS based on their common ownership, functional interdependence, and purportedly

illegitimate purpose. The plaintiffs claim that Mr. Mealing and Ms. Hasney created the entity defendants to insulate ACCS from FDCPA liability after being sued in 2000. The defendants say each entity has its own legitimate business purpose, so the entity defendants cannot be held vicariously liable for ACCS's actions.

The plaintiffs' alter ego argument centers on the roles Don Mealing and Lynn R. Hasney played in ACCS and the other entity defendants. Mr. Mealing and Ms. Hasney are former ACCS officers and shareholders of ACCS, which has existed in corporate form since 1995, when Mr. Mealing incorporated the business he had started in 1987. Ms. Hasney joined ACCS in 1996, and acquired a 21% interest in ACCS by 2001. ACCS was wholly owned by Mr. Mealing and Ms. Hasney. ACCS was the entity with which prosecutors contracted for the check restitution program. In September 2000 ACCS was sued in the first of a number of FDCPA lawsuits.

In 2001 Mr. Mealing and Ms. Hasney spun off ACCS's operational functions of ACCS, Inc. to new corporations they created. They also set up a consulting partnership to which the related corporations paid all their net income. ACCS remained the corporate face to the public, with the other corporations performing functions ACCS had performed previously. ACCS was wound up with no employees. Mr. Mealing and Ms. Hasney were the sole shareholders of the corporate defendants and the sole partners the only non-corporate business-entity defendant (FPS).

**FPS.** Fundamental Performance Strategies is a California General

Partnership. FPS provided consulting services, including operational management services and marketing services, to help position ACCS for sale. FPS was owned by a partnership (Inc. Fundamentals) and LRH Group, each of which was a one-person corporation set up as an employee stock ownership plan. Mr. Mealing was the sole shareholder of Inc. Fundamentals (he formed Inc. Fundamentals when he formed the other ACCS-related entities), while Ms. Hasney was LRH Group's sole shareholder. In effect, then, Mr. Mealing and Ms. Hasney were the sole partners of FPS. FPS researched and explored areas unrelated to the bad check restitution program in which ACCS could expand its business. FPS didn't advise ACCS on issues related to the diversion program, communicate with check writers, or create manuals or program materials for the educational classes offered in connection with the bad check restitution program.

Ms. Hasney and Mr. Mealing decided how much clients would pay FPS. The partnership's address was the same as that of all the other ACCS-related entities. FPS had no office, and neither FPS nor its partners paid any rent. FPS had no hard overhead costs, such as rent, phone or printing. It has no remaining business records other than some invoices. It had no physical assets. Between January 2002 and December 2003, FPS's net income — paid by other ACCS-related entities — exceeded $7.5 million. The other ACCS-related entities had almost no remaining income after paying FPS. Mr. Hasney went to work at FPS and left ACCS, though he remained as ACCS's acting CEO for a time until his replacement was hired. Mr. Mealing continued to use the ACCS CEO job title,

continued to correspond with prosecutors on ACCS letterhead, and continued to sign contracts between ACCS and prosecutors as ACCS president even when he claimed that he no longer was president of ACCS.

**Inc. Fundamentals.** Inc. Fundamentals is a California corporation. Inc. Fundamentals is the general partner of Fundamental Performance Strategies but had no direct involvement in ACCS's operation during the period in question.

**Fulfillment Unlimited, Inc.** FUI is a California corporation that provided printing and mailing services to ACCS from June 2001 to November 2004. Mr. Mealing and Ms. Hasney formed FUI for that purpose. Mr. Mealing and Ms. Hasney were officers and directors, and the sole shareholders, of FUI. FUI took over the printing and mailing functions previously performed within ACCS, including printing notices, advertising materials, informational brochures, business forms and course materials created by ACCS and/or the prosecuting attorney for use in the bad check diversion program. FUI printed and/or mailed these materials only as ACCS or a prosecuting attorney directed. FUI also provided printing and mailing services to other companies not affiliated with ACCS.

Prosecuting attorneys signed one-page agreements with FUI. ACCS paid FUI from bank accounts into which it deposited collection proceeds. The prosecuting attorneys had no direct dealings with FUI.

ACCS Admin employed and supplied FUI's staff; FUI had no employees. FUI paid ACCS Admin $73,110.64 in 2002, about $10,000 more than what FUI reported for "Payroll and related expenses." FUI paid ACCS Admin $166,345.33

in 2003, about twice what FUI reported for "Payroll and related expenses."

FUI and FPS executed a "Management and Marketing Services Agreement" in July 2001, making FPS responsible for providing "operational management services, including . . . personnel [and] contract administration services." FUI paid FPS $10,000 per month in 2001, and $15,000 per month, or $180,000 per year, starting January 2002. FPS also was entitled to an additional Quarterly Negotiated Compensation Payment. FPS billed FUI $100,000 for a bonus in 2003, so FUI paid FPS $280,000 in 2003 — about 23 percent of its gross revenue, leaving FUI with net pre-tax income of $34,070.

**ACCS Admin.** ACCS Administration, Inc., a California corporation, was formed as an employee stock ownership plan. Mr. Mealing and Ms. Hasney were its trustees, officers and directors. ACCS Admin supplied ACCS with personnel in connection with the operation of the bad check restitution program from January 2002 until November 2004 under an independent contractor agreement. Ms. Hasney signed the independent contractor agreement as both President of ACCS and President of ACCS Admin. She also signed an employment contract with ACCS Admin, under which she hired herself to direct and control all of the ACCS Admin employees. Ms. Hasney set her own pay as an ACCS Admin employee.

In accordance with that agreement, ACCS Admin also provided staffing services to businesses unrelated to ACCS.

Apart from Mr. Mealing, everyone who worked at ACCS was an ACCS Admin employee. ACCS Admin employees communicated with prosecuting attorneys on

ACCS letterhead. ACCS Admin had the same address as ACCS but didn't pay rent. Paul Fischer was hired as President and CEO of ACCS Admin in June 2003. Mr. Fischer's employment agreement entitled him to a "Change of Control" bonus if the "Company" was sold during the term of his employment. That bonus was based on a percentage of the selling price of the "Company." The "Company" was ACCS, not ACCS Admin. Ms. Hasney signed Mr. Fischer's employment agreement as Chairman of ACCS Admin.

For calendar year 2002, Mr. Mealing and Ms. Hasney, as directors of ACCS Admin, approved receipt of $11,630,790.33 in compensation from ACCS, and $12,571,837.55 in compensation from ACCS in 2003. Both figures exceeded the total gross revenues that ACCS reported for those years. ACCS Admin had no physical assets or hard overhead costs, such as rent, phone or printing.

Mr. Mealing built and owned the San Clemente, California office building that all the companies listed as their address. Mr. Mealing funded part of the building's $2.6 million construction cost with a $275,000 personal loan from ACCS. Once the building was up, ACCS entered into a long-term, non-cancelable lease under which it had to pay Mr. Mealing $2.3 million over the next six years.

ACCS properly maintained all corporate filings, was in good standing with the California Secretary of State, and maintained adequate liability insurance throughout the relevant time period. Neither Mr. Mealing, Ms. Hasney nor any of the ACCS-related entities ever commingled funds with ACCS, and none of the ACCS-related entities ever made any loans or advances to ACCS. FUI, FPS, ACCS

Admin, and Inc. Fundamentals filed separate tax returns, kept separate financial records, and maintained independent corporate/partnership records.

ACCS was a viable, full-time business. It had more than $2.6 million in assets and $11 million in revenues during 2003, and more than $1.4 million in assets and $10 million in revenue in 2002. ACCS had 200 employees in 2003, and has more than 350 employees today. Although they were the only shareholders of ACCS and the related entities, Mr. Mealing and Ms. Hasney were not the only officers or directors of ACCS. None of the ACCS-related entities owned ACCS stock or exercised any control over ACCS's operation. The defendants haven't produced any of the inter-company agreements, or any other admissible evidence detailing the relationships between the entities.

In November 2004, Mr. Mealing and Ms. Hasney sold 90% of their interest in ACCS to outside investors for about $30 million. The ACCS-related entities weren't purchased along with ACCS, and ceased operations after the sale. When Mr. Mealing and Ms. Hasney offered ACCS for sale in 2004, the prospective buyers requested preparation of a financial statement that combined the financial information for ACCS, ACCS Admin., FUI and FPS. According to the financial statement, the companies operated together through common ownership and/or control.

The class period in this case began July 19, 2004. Of the sixteen official notices about which plaintiffs complain, four (and none of notices sent to Mr. Wright) were sent before the November 2004 sale. The Indiana prosecuting

attorneys contracted with ACCS, not with any ACCS-related entities, to assist in the administration of their diversion programs. None of the ACCS-related entities are named or mentioned in any of the written communications upon which the plaintiffs base their FDCPA, fraud and misrepresentation claims.

C

Many electronic pages have been filed in this court with respect to a "Master Factoring Agreement" between FPS and ACCS. It appears that this agreement required FPS to make certain payments to ACCS based on the number of dishonored checks. The plaintiffs received the agreement through discovery in a case pending against ACCS in the United States District Court for the Northern District of California. The plaintiffs claim that this shift of money from FPS to ACCS was an abuse of the corporate form, and so is relevant to the alter ego issue. The plaintiffs claim the defendants in this case should have disclosed the factoring agreement in response to an interrogatory ("Describe the relationship of each Defendant to each other Defendant.") and deposition testimony by Ms. Hasney and Mr. Mealing.

Because the defendants didn't disclose the agreement, the plaintiffs seek an order deeming as admitted that the company defendants were alter egos of Mr. Mealing and Ms. Hasney until they sold their majority interest. Alternatively, the plaintiffs ask that discovery be reopened to allow them to pursue further discovery concerning the relationship between FPS and the other entity defendants.

The entity defendants don't appear to have concealed or failed to respond with respect to the factoring agreement. This is not to say that the defendants rely on a coquettish assertion that the plaintiffs never quite asked the right question: the defendants cite excerpts of the individual defendants' depositions in which they virtually stated the factoring agreement's existence. The court would be hard pressed to find a violation of either Rule 26(g) or Rule 37(c) of the Federal Rules of Civil Procedure.

This motion is another incarnation of an issue the plaintiffs have presented unsuccessfully earlier in this case. When the plaintiffs discovered the agreement's existence, they didn't move to reopen discovery; instead, they attempted an end run around the discovery deadline by subpoenaing their own counsel to get the document. Magistrate Judge Nuechterlein denied the plaintiffs' request to supplement their summary judgment motion with the appendix, finding that there was no evidence of bad faith on the defendants' part and so no good cause to modify the briefing schedule. If the subpoena was an end run, this play appears to be a halfback pass off a fake sweep.

The court has been down this road before with the parties. The plaintiffs offer nothing that wasn't known when the magistrate judge denied the earlier attempts. To order a contention admitted on grounds earlier deemed too weak to allow the plaintiffs to supplement their summary judgment submission would be senseless. The court denies the plaintiffs' motion to deem the alter ego contention admitted or, alternatively, to reopen discovery.

II

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact couldn't find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Crull v. Sunderman, 384 F.3d 453, 459-460 (7th Cir. 2004). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the nonmovant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004); Rand v. CF Indus., Inc., 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors.").

The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); see also Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("As we have said before, summary

16

judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.'" (citation omitted)); Anderson v. Liberty Lobby, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). "With cross-motions, our review of the record requires that we construe all inferences in favor of the party against whom the motion under consideration is made." Hess v. Reg-Ellen Mach. Tool Corp., 423 F.3d 653, 658 (7th Cir. 2005) (quoting Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund, 390 F.3d 1040, 1045 (7th Cir.2004)).

A

The plaintiffs seek summary judgment on both their FDCPA and misrepresentation claims. First, they argue that money owed on unpaid checks written to retail merchants is "debt" and that private entities that collect such debt are "debt collectors" within the meaning of the FDCPA. The plaintiffs say that since the FDCPA is a strict liability statute, proof of one violation is sufficient to support summary judgment on their claims. The plaintiffs set out a series of potential violations, including collecting charges not authorized under Indiana's pre-trial diversion statute, falsely representing the amount of debt that the check writers owe, falsely representing that a county prosecuting attorney sent the notice letters, simulating the prosecutor by using their letterhead, threatening to

have check writers prosecuted if they don't meet ACCS's demands, failing to provide mandatory disclosures about debt collection, and failing to inform check writers of their rights under the FDCPA. The plaintiffs argue that they are entitled to declaratory relief in addition to statutory and actual damages.

Next, the plaintiffs assert that they have established that the defendants are liable for actual fraud based on material misrepresentations in the notice letters that the defendants knew were false and upon which the plaintiffs relied. Finally, the plaintiffs claim that the entity defendants, Don Mealing, and Lynn Hasney should be deemed a single economic enterprise along with ACCS for purposes of FDCPA liability.

ACCS responded to the motion before filing for bankruptcy, and the remaining defendants have adopted many of ACCS's arguments. They say ACCS isn't a debt collector under the FDCPA, and instead operates as a wholly ministerial agent of the prosecutor's office. The defendants say the prosecutor isn't collecting debt when it offers criminal restitution because the FDCPA only regulates civil debt collection, not voluntary alternatives to criminal prosecution. Thus, the defendants reason, neither the prosecutor nor its agent ACCS is subject to FDCPA liability.

The defendants submit a bona fide error defense in case the FDCPA applies, claiming that ACCS didn't intend to violate the FDCPA, any violation was a bona fide error, and ACCS had adopted procedures reasonably adapted to avoid such error. As for the fraud claims, the defendants say the notice letters are not

materially misleading regarding their origin, the probability of prosecution, or the statutory authority for the diversion program. They also say there is no evidence that ACCS intended to deceive the plaintiffs or that the plaintiffs relied on any misrepresentations to their detriment.

The entity defendants also responded separately to the plaintiffs' motion, arguing that the plaintiffs can succeed on their claims against them only if they can establish alter ego liability, which requires more than a showing of common ownership. The entity defendants state that there has been no showing of fraud or injustice or that ACCS abused corporate privilege and structure. The entity defendants believe that the plaintiffs' fraud claims must fail because the plaintiffs haven't shown that any false representations came from the entities as opposed to ACCS.

In support of their own summary judgment motion, the entity defendants argue as a threshold issue that the FDCPA doesn't apply to criminal diversion programs, and, even if it did, they aren't vicariously liable because there are no grounds for piercing the corporate veil. The entity defendants stress that the plaintiffs have failed to carry their burden of proving a unity of interest such that corporate separateness has ceased or that there is fraud or injustice to support an alter ego finding. The plaintiffs respond that Mr. Mealing and Ms. Hasney developed, initiated, and controlled the collection process and so are "debt collectors" under the FDCPA. Moreover, they claim that the entity defendants are alter egos of Mealing and Hasney because of the lack of separate operation and

abuse of the corporate form.

After filing their reply brief, the entity defendants separately moved the court for leave to reply to the plaintiffs' statement of genuine issues under Local Rule 7.1(b), arguing that the rule is silent as to whether an additional reply is acceptable. The entity defendants allege that the plaintiffs' statement of issues cross-references facts filed in support of their own motion for summary judgment that aren't discussed in their opposition brief and are outside the scope of their summary judgment motion. The plaintiffs respond that Local Rule 56.1 doesn't authorize a further reply.

B

The court denies the entity defendants' motion for leave to file an additional reply. ACCS and the entity defendants were afforded an opportunity to reply to the plaintiffs' response, and they did so. They now move for leave to file additional appendices, which consist of a list of the plaintiffs' alleged genuine issues followed by argument and citations to the record. Local Rule 56.1 provides that "any reply" must be filed within 15 days of the response, so the defendants' additional replies aren't timely. Further, the entity defendants haven't established a need for the additional replies. Although the defendants argue that the plaintiffs' statements contain facts outside the scope of their motion and cross-references to the plaintiffs' motion for summary judgment, the defendants adequately addressed these arguments in their responses to the plaintiffs' motion. A further reply isn't

warranted, and doesn't add any value to the defendants' argument.

C

Of the parties' many and varied arguments, one is dispositive, given the ACCS bankruptcy. None of the related entities had any contact with the named plaintiffs or their class, so they are entitled to summary judgment unless the plaintiffs can establish either that the entity defendants are themselves "debt collectors" or that the entity defendants are alter egos of ACCS. The plaintiffs can show neither.

In White v. Goodman, 200 F.3d 1016 (7th Cir. 2000), Patricia White had received a dunning letter from North Shore Agency, Inc. (a debt collection service) and Book-of-the-Month Club (a creditor, in Ms. White's instance). Believing the letter violated the Fair Debt Collection Practices Act, Ms. White brought a class action against North Shore, the Book-of-the-Month Club, a company that stuffed envelopes for North Shore, and a North Shore shareholder. The court of appeals made short shrift of the claims against the stuffer and the shareholder:

> So far as the joinder of defendants other than North Shore and Book-of-the-Month Club is concerned, the suits are frivolous and the plaintiffs, represented by an experienced practitioner in consumer finance litigation, should have been sanctioned for what amounts to malicious prosecution. The Fair Debt Collection Practices Act is not aimed at the shareholders of debt collectors operating in the corporate form unless some basis is shown for piercing the corporate veil, which was not attempted here, Aubert v. American General Finance, Inc., 137 F.3d 976, 979-80 (7th Cir.1998), or at companies that perform ministerial duties for debt collectors, such as stuffing and printing the debt collector's letters. Laubach v. Arrow Service

21

Bureau, Inc., 987 F.Supp. 625, 629-31 (N.D.Ill.1997); Trull v. Lason Systems, Inc., 982 F.Supp. 600, 607-08 (N.D.Ill.1997); (citation omitted). The joinder of these defendants illustrates the all-too-common abuse of the class action as a device for forcing the settlement of meritless claims and is thus a mirror image of the abusive tactics of debt collectors at which the statute is aimed.

200 F.3d at 1019.

In Pettit v. Retrieval Masters Creditors Bureau, Inc., 211 F.3d 1057 (7th Cir. 2000), Lori Pettit believed that the name of an entity that sent her a letter led unsophisticated debtors to believe that the correspondent was a credit bureau rather than a collection agency. She sued the business and its largest shareholder, Russell Fuchs, for violating the Fair Debt Collection Practices Act. The trial court rejected the claim against Mr. Fuchs for want of a showing that Mr. Fuchs exercised significant day-to-day control over the company. The court of appeals affirmed the holding, but explained that the district court had applied the wrong test:

under our holding in White v. Goodman, the extent of control exercised by an officer or shareholder is irrelevant to determining his liability under the FDCPA. Because such individuals do not become "debt collectors" simply by working for or owning stock in debt collection companies, we held that the Act does not contemplate personal liability for shareholders or employees of debt collection companies who act on behalf of those companies, except perhaps in limited instances where the corporate veil is pierced. Rather, the FDCPA has utilized the principle of vicarious liability. Just as in the Title VII context, the debt collection company answers for its employees' violations of the statute. With vicarious or *respondeat superior* liability, the debt collection company "and its managers have the proper incentives to adequately discipline wayward employees, as well as to instruct and train employees to avoid actions that might impose liability." Individuals who do not otherwise meet the statutory definition of "debt collector" cannot be held liable under the Act. As

we mentioned in <u>White</u>, FDCPA suits against the owners of a debt collection company who are not otherwise debt collectors are frivolous and might well warrant sanctions. The holding of <u>White</u> is equally applicable to this case, so regardless of whether Fuchs exercised extensive control over Retrieval Masters, the district court correctly granted summary judgment for Fuchs. Of course, Pettit may still seek redress from Retrieval Masters for any violations of the Act committed by Fuchs, since it is undisputed that Retrieval is a debt collector.

211 F.3d at 1059-1060 (citations and quotations omitted).

The entity defendants cite <u>White</u> and <u>Pettit</u> for the proposition that they cannot be liable to the plaintiffs for any FDCPA violation ACCS might have committed. The plaintiffs respond that Mr. Mealing and Ms. Hasney are debt collectors within the meaning of the FDCPA because they created and put the challenged collection process into motion. The FDCPA defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, *directly or indirectly,* debts owed or due or asserted to be owed or due another." 15 U.S.C. §1692a(6) (emphasis added). <u>Pettit</u>, the plaintiffs argue, holds only that officers and shareholders aren't liable for the principal's FDCPA violations simply because of their status, but doesn't exonerate officers and shareholders who themselves violate the FDCPA while acting as debt collectors.

The plaintiffs argue that Mr. Mealing and Ms. Hasney were themselves debt collectors within the meaning of the FDCPA. Mr. Mealing was instrumental in developing the process that ACCS uses, participated on an ongoing basis in

developing scripts and training materials, and drafted the first version of most manuals. Ms. Hasney was, as a practical matter, the chief operating officer for ACCS, to whom numerous operational departments reported. She was personally responsible for directing all the employees carrying on the check restitution program. The plaintiffs can't point to any communication directly between Mr. Mealing or Ms. Hasney and any check writer.

That Ms. Hasney did precisely what a corporate officer is expected to do distinguishes her situation not at all from that of Mr. Fuchs, the president Ms. Pettit sought to hold liable; neither does Mr. Mealing's having performed work for ACCS long before the class period began. No reasonable trier of fact could find that Ms. Hasney or Mr. Mealing was a "debt collector" (as opposed to merely an officer, director, or employee of a debt collector) within the meaning of the FDCPA.

White and Pettit left open the possibility that those working with or for a debt collector could be liable for the debt collector's FDCPA violations on an alter ego theory, and the plaintiffs contend that ACCS, ACCS Admin, FUI, and Inc. Fundamentals, were alter egos of Mealing and Hasney. They argue that a month after ACCS was first sued in a FDCPA suit, Mr. Mealing and Ms. Hasney set about a scheme to create a series of business facades so that if they (through ACCS) were violating the FDCPA, there would be no solvent entity to satisfy a judgment. They spun-off ACCS's operational functions to new corporations and set up a consulting partnership to which all the corporations paid all their net income.

The entity defendants argue that the plaintiffs' showing fails as a matter of

law as proof of an alter ego relationship. They argue that because ACCS is a California corporation, California law governs the alter ego determination. Stromberg Metal Works, Inc. v. Press Mech., Inc., 77 F.3d 928, 933 (7th Cir. 1996); Kellers Systems, Inc. v. Transport Int'l Pool, Inc., 172 F.Supp. 2d 992, 1000 (N.D. Ill. 2001); RESTATEMENT (2D), CONFLICT OF LAW §§ 307, 309 (1971). California courts, the entity defendants argue, view the alter ego doctrine as an "extreme remedy, sparingly used." Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 539 (2000); *see also* Seretti v. Superior Nat'l Ins. Co., 71 Cal. App. 4th 920, 931 (1999); Mesler v. Bragg Mgmt. Co., 39 Cal.3d 290, 301 (1985); Cooperman v. Unemployment Ins. Appeals Bd., 49 Cal. App.3d 1, 7 (1975). To succeed on their alter ego argument at this summary judgment stage, the plaintiffs must come forth with evidence sufficient to establish such a unity of interest in ownership so that the separateness of the person and corporation has ceased, and that the facts are such that an adherence to the fiction of a separate existence of the corporation would sanction a fraud or promote injustice under the case's specific circumstances. Minifie v. Rowley, 187 Cal. 481, 487 (1922); *see also* Kohn v. Kohn, 95 Cal. App. 2d 708, 718 (1950).

The plaintiffs don't disagree with the entity defendants about the requirements of California law, but disagree as to the source of the controlling law. The plaintiffs contend that federal common law[1] governs substantive liability for

---

[1] The plaintiffs argue that under federal common law, the separation between corporate entities is disregarded if special circumstances (such as inadequate capitalization, absence of independent activity, action in the interest of the parent rather than the subsidiary, and failure

tortious acts in violation of the FDCPA. See <u>Newman v. Checkrite</u>, 912 F. Supp. 1354, 1369 n.19, (E.D. Cal. 1995). The plaintiffs note accurately that in both of the cases that the entity defendants cite for the proposition that state law controls — <u>Stromberg Metal Works, Inc. v. Press Mech., Inc.</u>, 77 F.3d 928 (7th Cir. 1996) and <u>Kellers Sys. v. Transp. Int'l Pool, Inc.</u>, 172 F. Supp. 2d 992 (N.D. III 2001) — jurisdiction was based on diversity of citizenship, not a federal question, and federal common law wasn't proposed as governing. The plaintiffs say, "Defendants do not cite any federal question case where a court rejected application of federal common law in deciding whether to pierce the corporate veil. In all the FDCPA cases that plaintiffs have found where this issue is addressed, courts have applied federal common law." Unfortunately, no citation accompanies the last point, and none of the plaintiffs' cited court of appeals cases applied federal common law to FDCPA defendants.

Federal common law is no more firmly ensconced as a rule of decision than in ERISA cases, and even in ERISA cases, courts turn to state law to determine whether parties have disregarded the corporate veil. *See, e.g.*, <u>Laborers' Pension</u>

---

to observe the legal requirements of separate corporate existence) show that the corporations should be deemed a single economic enterprise. <u>United States v. ACB Sales & Serv., Inc.</u>, 590 F. Supp. 561, 572-76 (D. Ariz. 1984). The plaintiffs also argue that state corporate laws can't frustrate federal objectives, so federal courts "look closely at the purpose of the federal statute to determine whether the statute places importance on the corporate form, an inquiry that usually gives less respect to the corporate form than does the strict common law alter ego doctrine." <u>Town of Brookline v. Gorsuch</u>, 667 F.2d 215, 221 (1st Cir. 1981). The plaintiffs view federal courts as more likely than state courts to pierce the corporate veil to effectuate federal policy. <u>Pearson v. Component Tech. Corp.</u>, 247 F.3d 471, 484-485 (3rd Cir. 2001), *cited in* <u>LeClercg v. Lockformer Co.</u>, 2002 U.S. Dist. LEXIS 7988, at *14 (N.D. II. 2002).

The court needn't evaluate federal common law on this point further because the court finds California law controls the alter ego decision.

<u>Fund v. Lay-Com, Inc.</u>, ___ F.3d ____, 2009 WL 2768493 at *4 (7th Cir. Sept. 2, 2009) ("Veil-piercing is an equitable remedy governed by state law, here the law of Illinois because that is where all of the corporations at issue were incorporated. We have jurisdiction by virtue of the funds' original claim for relief under ERISA . . ..."). The court is persuaded that the law of the entity's state of incorporation provides the test to decide whether one entity (or person) is the alter ego of another. In today's case, that state is California.

The plaintiffs easily demonstrate a unity of interest in ownership: Mr. Mealing and Ms. Hasney ultimately were the sole owners of ACCS, ACCS Admin, FUI, and Inc. Fundamentals, at least between the July 2004 class period start date and the sale of ACCS four months later. But no reasonable trier of fact could find, on this record, that the separateness of the persons and that corporations had ceased. The corporate form was not disregarded with respect to any of the corporations. All of the corporations maintained all corporate filings, filed their own tax returns, and were in good standing with the California Secretary of State. FUI and ACCS Admin did work for customers other than ACCS. Although business was transacted between the various entities pursuant to written agreements, no funds were commingled and no loans or advances were made between the corporations (apart from the factoring agreement already discussed). The plaintiffs contend that Mr. Mealing and Ms. Hasney disserved ACCS when they spun off various essential services into separate corporations, but it remains that ACCS was sold for $30 million in November 2004.

Because no reasonable trier of fact could find that the separateness of these entities had ceased, California law requires that the corporate form be observed. These defendants cannot be liable for any FDCPA violations ACCS may have committed. They are entitled to summary judgment on the plaintiffs' claims against them.

## III

For the foregoing reasons, the court:

1. DENIES the motions of ACCS Administration Inc., Fulfillment Unlimited Inc., Fundamental Performance Strategies, Lynn Hasney, Inc. Fundamentals, and Don Mealing to file a reply to plaintiffs' statements of genuine issues (doc. #221) and to file an amended appendix to their reply brief (doc. #251);

2. DENIES the Plaintiffs' Motion to Deem Admitted That Defendants American Corrective Counseling Services, Inc., Inc. Fundamentals, Fulfillment Unlimited, Inc., Fundamental Performance Strategies, and Accs Administration, Inc. Were Alter Egos of Defendants Don Mealing and Lynn Hasney Through November 10, 2004, Or, in the Alternative, to Reopen Discovery on the Issue of Alter Ego Liability (doc. #305).

3. GRANTS the motion for summary judgment filed by ACCS Administration Inc., Fulfillment Unlimited Inc., Fundamental Performance Strategies, Lynn Hasney, Inc. Fundamentals, and Don Mealing (doc. #205);

and

4. DENIES all other pending motions (doc. #173, 240, 242, and287).

Still pending are the summary judgment motion of American Corrective Counseling Services Inc. (doc. #217), American Corrective Counseling Services Inc.'s motion for leave to file appendix to reply brief (doc. #215) and the plaintiffs' summary judgment motion to the extent it seeks relief against American Corrective Counseling Services Inc. (doc. # 173). ACCS's bankruptcy prevents the court from addressing those motions. Accordingly, the court ORDERS this case closed for statistical purposes, to be re-opened on motion of any remaining party after conclusion of the ACCS bankruptcy proceedings.

SO ORDERED.

ENTERED:  September 30, 2009


     /s/ Robert L. Miller, Jr.
Robert L. Miller, Jr., Chief Judge
United States District Court